**Angelo R. Bianchi, Esq.**
**Law Offices of Angelo R. Bianchi, LLC**
**80 Orchard Street**
**Bloomfield, New Jersey 07003**
**973-680-9900 Tel / 973-680-9909 Fax**
**Attorneys for the Defendant, Leticia, Inc.**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSEPH A. FERRARA, SR., FRANK H. FINKEL, MARC HERBST, THOMAS N. PIALI, DENISE RICHARDSON, ANTHONY D'AQUILA, THOMAS GESUALDI, LOUIS BISIGNANO, DOMINICK MARROCCO, and ANTHONY PIROZZI, as Trustees and Fiduciaries of the Local 282 Pension Trust Fund, the Local 282 Annuity Trust Fund, the Local 282 Job Training Trust Fund, and the Local 282 Vacation and Sick Leave Trust Fund, | Civil Action No.: 09-cv-3032 |
| Plaintiffs, | |
| -against- | SECOND AMENDED ANSWER AND COUNTERCLAIMS |
| LETICIA, INC. and YORK – JERSEY HAULERS, INC. | |
| Defendants. | |

**DEFENDANT LETICIA, INC'S SECOND AMENDED ANSWER, DEFENSES
AND COUNTERCLAIMS TO PLAINTIFF'S AMENDED COMPLAINT AND
DEMAND FOR JURY TRIAL**

Defendant, Leticia, Inc. ("Leticia"), by and through its attorneys, the Law Offices of

Angelo R. Bianchi, LLC, as and for its Second Amended Answer and Defenses, and

Counterclaims herein state as follows:

1

## INTRODUCTION

While parading under the guise of a simple action to collect benefit fund contributions, the instant action is, in reality, only the latest step in a long campaign by the Local 282 Union, Union Officials, the Local 282 Trust Funds, and other Counterclaim Defendants who acted in concert with Building Material Teamsters' Local 282 ("Local 282" or "Union"), to persecute and harass Leticia and ruin its business prospects by imposing on Leticia purported contractual obligations that do not exist and are not being demanded of any other non-Hispanically owned business operating under the same labor agreement ("MTA CBA").

Plaintiffs' Amended Complaint seeks (1) payment by Leticia of monies purportedly due and owing to the Local 282 Welfare Trust Fund, the Local 282 Pension Trust Fund, the Local 282 Annuity Trust Fund, the Local 282 Job Training Trust Fund, and the Local 282 Vacation and Sick Leave Trust Fund (collectively, "Local 282 Funds") based upon three audits conducted by the Plaintiffs' auditors, (2) production of books and records of two entities for audit in which the owner of Leticia, Leticia Rojas, purportedly had an ownership interest during the period of time in issue, (3) payment of the purported amounts due and owing from an audit of Defendant York-Jersey Haulers, Inc. ("York-Jersey"), a separate and distinct entity from Leticia owned by someone other than Leticia's owner, and (4) joint and several liability of both Leticia and York-Jersey for the claims set forth in (1) through (3).

With respect to (1), Leticia has timely objected in writing to the reported results of each of the Funds' three audits of Leticia at issue in this action and, in some cases, for more than 18 months prior to the commencement of this action Leticia attempted to resolve its objections to no avail, largely because the Plaintiffs refused to provide relevant information to Leticia in response to Leticia's detailed written objections to the audits. In fact, although the Funds had made a

recalculation and reduction of Leticia's purported liability under one of the audits prior to the commencement of this action, the Funds did not share the revised audit with Leticia before commencing this action, and, in fact, made a claim for the original audit figure in the Complaint, knowing that it was inflated and contradicted by their own recalculation. Although Plaintiffs have revised and substantially reduced each of the audit claims to which Leticia has objected, to date the Plaintiffs have neither addressed all of Leticia's objections nor provided Leticia with all of the information requested in connection with the audits at issue in this case, thereby thwarting Leticia's good faith efforts to resolve the audits at issue without litigation. In any event, Leticia owes nothing to the Local 282 Funds for these three audits and is in fact due a credit from the Funds for overpayments during the past several years.

With respect to (2), Leticia advised Plaintiff's auditors more than two years ago that 76 Tonnelle Friendly Service Ltd. was not operational during the period at issue and that Leticia Trucking Rental had no employees on payroll. Accordingly, there are no records for 76 Tonnelle Friendly Services. Moreover, Leticia Rojas, the sole owner of Leticia, has never had any ownership or other interest in 76 Tonnelle Friendly Service. With respect to Leticia Trucking Rental, its records were submitted for audit four months ago. Thereafter, after Leticia informed the audit was completed, a request for additional Leticia Trucking Rental records was made by the Plaintiffs' auditor. The auditor indicated to Leticia that he would not be in a position to review the additional information until in or about the week of July 16, 2010, at the earliest. Leticia was prepared to have the auditor review those additional requested records in that time frame and has communicated that fact to the Plaintiffs.

With respect to (3), York-Jersey is neither an alter ego of, single or joint employer with, nor a double breasted oepration of Leticia. By wholly adopting and seeking to enforce the stated

3

position of Local 282 in this dispute, the Plaintiffs have lost their independence as Trustees and are clearly operating as agents of Local 282. Accordingly, neither Leticia nor York-Jersey have any liability to the Funds attributable to the work of York-Jersey.

### JURISDICTION AND VENUE

1.      Admits the allegations in paragraph 1 of the Amended Complaint.

2.      Admits the allegations in paragraph 2 of the Amended Complaint.

### THE PARTIES

3.      Admits upon information and belief the allegations in paragraph 3 of the Amended Complaint and avers that the Trustees have exercised their discretion and control over the Funds in a manner that is arbitrary and capricious, in bad faith, discriminatory towards Leticia, wantonly impairing her business and business prospects and, ultimately, to the detriment of Leticia's drivers, and the very Funds that the Plaintiffs are charged to protect.

4.      Admits upon information and belief the allegations in paragraph 4 of the Amended Complaint and avers that, notwithstanding the Funds' Board of Trustees' equal representation of labor and management representatives, the Funds are dominated and controlled by those Trustees who are also officers or agents of Local 282, namely Thomas Gesualdi, Louis Bisignano, Anthony Pirozzi, Anthony D'Aquila, Dominick Marrocco.

5.      Admits upon information and belief the allegations in paragraph 5 of the Amended Complaint and avers that the Funds, in active concert with and as agents for the Union, have, since at least 2004, intentionally refused to monitor and enforce the MTA CBA equally as to all industry employers, but have spent inordinate and disproportionate efforts to coerce Leticia into paying wages and Local 282 Funds' contributions dramatically higher than similarly situated

employers for the discriminatory reason that Leticia, unlike all other industry employers, is owned and actively managed by an Hispanic woman.

6.      Denies having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 6 of the Amended Complaint and avers that Leticia has requested of the Trustees, but has never been provided a copy of the Trust Agreement.

7.      Denies having knowledge sufficient or information to form a belief as to the truth of the allegations in paragraph 7 of the Amended Complaint and avers that Leticia has requested of the Trustees, but has never been provided a copy of the Trust Agreement.

8.      Denies the allegations in paragraph 8 of the Amended Complaint, except admits that Leticia is and has been at all times relevant to this action a New Jersey corporation engaged in providing truck hauling services for excavated material in connection with heavy construction ("excavation trucking") principally located in the City and County of New York, New York, with its principal office and place of business at 640 Irvington Avenue, Hillside, New Jersey, and denies having knowledge or information sufficient to form a belief as to the truth of the allegation regarding the Trust Agreement.

9.      Denies the allegations in paragraph 9 of the Amended Complaint, except admits, on information and belief, that York-Jersey is a New Jersey corporation.

## FACTUAL BASIS FOR CLAIMS

### The Collective Bargaining Agreements, the Trust Agreement, and The Obligations to Contribute to the Funds and Submit to Audit.

10.      Admits the allegations in paragraph 10 of the Amended Complaint.

11.      Admits the allegations in paragraph 11 of the Amended Complaint.

12.     Denies the allegations in paragraph 12 of the Amended Complaint as calling for a legal conclusion and respectfully refers to the Court to the text of the CBAs and the Trust Agreement for their content and meaning.

13.     Denies having knowledge or information sufficient to form a belief as to the truth of the allegations of the facts contained in paragraph 13 of the Amended Complaint, and respectfully declines to answer those portions of paragraph 13 that constitute legal conclusions for which no responsive pleading is required.

14.     Denies having knowledge or information sufficient to form a belief as to the truth of the allegations of fact in paragraph 14 of the Amended Complaint that constitute legal conclusions for which no responsive pleading is required.

15.     Denies having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 15 of the Amended Complaint, noting again that Leticia has requested of the Trustees but has not been provided with a copy of the Trust Agreement. Further, paragraph 15 of the Amended Complaint consists solely of legal conclusions to which no response is required, and Leticia respectfully refers the Court to the text of the Trust Agreement for its content and meaning.

16.     Denies having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 16 of the Amended Complaint,  noting again that Leticia has requested of the Trustees but has not been provided with a copy of the Trust Agreement. Further, paragraph 16 of the Amended Complaint consists solely of legal conclusions to which no response is required, and Leticia respectfully refers the Court to the text of the Trust Agreement for its content and meaning.

17.     Denies having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 17 of the Amended Complaint, noting again that Leticia has requested of the Trustees but has not been provided with a copy of the Trust Agreement. Further, paragraph 17 of the Amended Complaint consists solely of legal conclusions to which no response is required, and Leticia respectfully refers the Court to the text of the Trust Agreement for its content and meaning.

18.     Denies having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 18 of the Amended Complaint, noting again that Leticia has requested of the Trustees but has not been provided with a copy of the Trust Agreement. Further, paragraph 18 of the Amended Complaint consists solely of legal conclusions to which no response is required, and Leticia respectfully refers the Court to the text of the Trust Agreement for its content and meaning.

19.     Denies having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 19 of the Amended Complaint, noting again that Leticia has requested of the Trustees but has not been provided with a copy of the Trust Agreement. Further, paragraph 19 of the Amended Complaint consists solely of legal conclusions to which no response is required, and Leticia respectfully refers the Court to the text of the Trust Agreement for its content and meaning.

20.     Denies having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 20 of the Amended Complaint, noting again that Leticia has requested of the Trustees but has not been provided with a copy of the Trust Agreement. Further, paragraph 20 of the Amended Complaint consists solely of legal conclusions to which no

response is required, and Leticia respectfully refers the Court to the text of the Trust Agreement for its content and meaning.

21.     Denies having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 21 of the Amended Complaint, noting again that Leticia has requested of the Trustees but has not been provided with a copy of the Trust Agreement. Further, paragraph 21 of the Amended Complaint consists solely of legal conclusions to which no response is required, and Leticia respectfully refers the Court to the text of the Trust Agreement for its content and meaning.

### Leticia's Failure to Pay Contributions

22.     Denies the allegations in paragraph 22 of the Amended Complaint.

23.     Denies the allegations in paragraph 23 of the Amended Complaint.

### The Relationship Between Leticia and York-Jersey

24.     Denies the allegations in paragraph 24 of the Amended Complaint.

25.     Denies the allegations in paragraph 25 of the Amended Complaint, except admits that York-Jersey has never had a collective bargaining agreement with Local 282.

26.     Denies the allegations in paragraph 26 of the Amended Complaint.

27.     Denies the allegations in paragraph 27 of the Amended Complaint.

28.     Denies the allegations in paragraph 28 of the Amended Complaint.

29.     Denies the allegations in paragraph 29 of the Amended Complaint.

30.     Denies the allegations in paragraph 30 of the Amended Complaint.

31.     Denies the allegations in paragraph 31 of the Amended Complaint.

32.     Denies the allegations in paragraph 32 of the Amended Complaint.

33.     Denies the allegations in paragraph 33 of the Amended Complaint.

34.     Denies the allegations in paragraph 34 of the Amended Complaint.

35.     Denies the allegations in paragraph 35 of the Amended Complaint.

36.     Denies the allegations in paragraph 36 of the Amended Complaint.

**The Failure to Pay Amounts on the December 31, 2004 through December 30, 2005
Audit ("2005 Audit") of Leticia's Relevant Books and Records**

37.     Denies the allegations in paragraph 37 of the Amended Complaint, except admits
that the Plaintiffs have asserted claims against Leticia for the amounts set forth therein.

38.     Denies the allegations in paragraph 38 of the Amended Complaint, except admits
that the Plaintiffs have asserted claims against Leticia for the revised amounts set forth therein.

39.     Denies the allegations in paragraph 39 of the Amended Complaint, except admits
that Leticia still awaits responses from the Funds to its unanswered objections to the adjusted
2005 audit.

**The Failure to Pay Amounts due on December 31, 2005 through June 30, 2006
Audit ("2006 Audit") of Leticia's Relevant Books and Records**

40.     Denies the allegations in paragraph 40 of the Amended Complaint, except admits
that the Plaintiffs have asserted claims against Leticia for the amounts set forth therein.

41.     Denies the allegations in paragraph 41 of the Amended Complaint, except admits
that the Plaintiffs have asserted claims against Leticia for the amounts set forth therein.

42.     Denies the allegations in paragraph 42 of the Amended Complaint, except admits
that Leticia still awaits responses from the Funds to its unanswered objections to the adjusted
2006 Audit.

**The Failure to Pay Amounts due on July 4, 2006 through October 5, 2007
Audit ("2007 Audit") of Leticia's Relevant Books and Records**

43.     Denies the allegations in paragraph 43 of the Amended Complaint, except admits
that the Plaintiffs have asserted claims against Leticia for the amounts set forth therein.

9

44.     Denies the allegations in paragraph 44 of the Amended Complaint, except admits that the Plaintiffs have asserted claims against Leticia for the revised amounts set forth therein.

45.     Denies the allegations in paragraph 45 of the Amended Complaint, except admits that Leticia still awaits responses from the Funds to its unanswered objections to the adjusted 2007 Audit.

**The Failure to Permit an Audit of Affiliated Entities**

46.     Denies the allegations in paragraph 46 of the Amended Complaint, except admits that Leticia Trucking Rental has never had a collective bargaining agreement with Local 282 and that the Trustees, Local 282, and the Trustees' auditors failed to inform Leticia of the basis for any belief that other entities in which the owner of Leticia or her husband might have had an ownership interest, including, for example, a gas station owned by the husband of the owner of Leticia before he had even met and married her and which was already out of business prior to the beginning of the period of time asserted by Plaintiffs as being in question, and avers that such baseless audits were part and parcel of a concerted campaign orchestrated by the Trustees, the Local 282 Funds, and Local 282 to burden Leticia with vexatious, costly, time consuming diversions from its business mission that were intended to and did make the cost of continuing to do business prohibitive.

47.     Denies the allegations in paragraph 47 of the Amended Complaint, except admits that the requested books and records of Leticia Trucking Rental were submitted for audit, during which the Funds' auditor raised no questions concerning such records during the audit, and thereafter another demand for additional records of Leticia Trucking Rental was made, and those records have been made available in accordance with the timetable set by the auditor.

10

48.     Denies the allegations in paragraph 48 of the Amended Complaint, except admits that 76 Tonnelle Friendly Service, Ltd. has never had a collective bargaining agreement with Local 282 and that the Trustees, the Local 282 Funds, Local 282, and the Funds' auditors failed to inform Leticia of the basis for any belief that entities in which the owner of Leticia or her husband might have had an ownership interest, including, for example, this gas station owned by the husband of the owner of Leticia before he had even met and married her and which was already out of business prior to the beginning of the period of time asserted by Plaintiffs as being in question, and avers that such baseless audits were part and parcel of a concerted campaign orchestrated by the Trustees, the Local 282 Funds, and Local 282 to burden Leticia with vexatious, costly, time consuming and manufactured claims for Local 282 Funds contributions intended to divert Leticia's efforts from its business mission and to make the cost of continuing to do business prohibitive.

49.     Denies the allegations in paragraph 49 of the Amended Complaint, except admits that 76 Tonnelle Friendly Service, Ltd. has never been in business during the period in question and, accordingly, there are no records of the nature sought by Plaintiffs, and avers that the Plaintiffs have never provided Leticia with any explanation as to why they have continued to pursue this audit despite having been advised of the facts set forth herein years ago.

**The York Jersey Audit**

50.     Denies the allegations in paragraph 50 of the Amended Complaint, except admits that the Plaintiffs have made a demand upon Leticia for payment of the amounts set forth therein.

51.     Denies the allegations in paragraph 51 of the Amended Complaint, except admits that the Plaintiffs have made a demand upon Leticia for payment of the amounts set forth therein.

52.     Denies the allegations in paragraph 52 of the Amended Complaint.

11

## COUNT I

## AGAINST LETICIA FOR LIABILITY UNDER THE CBA

53.     In response to the allegations in paragraph 53 of the Amended Complaint, Leticia repeats and realleges its responses to paragraphs 1 through 52 of the Amended Complaint, as set forth above, as if same were fully set forth herein.

54.     Denies the allegations in paragraph 54 of the Amended Complaint as consisting solely of legal citation and partial quotation to which no response is required and respectfully refers the Court to the complete sources cited and quoted therein for their content and meaning.

55.     Denies the allegations in paragraph 55 of the Amended Complaint as consisting solely of legal citation and partial quotation to which no response is required and respectfully refers the Court to the complete sources cited and quoted therein for their content and meaning.

56.     Denies the allegations in paragraph 56 of the Amended Complaint as consisting solely of legal citation and partial quotation to which no response is required and respectfully refers the Court to the complete sources cited and quoted therein for their content and meaning.

57.     Denies the allegations in paragraph 57 of the Amended Complaint as consisting solely of legal citation and partial quotation to which no response is required and respectfully refers the Court to the complete sources cited and quoted therein for their content and meaning.

58.     Denies the allegations in paragraph 58 of the Amended Complaint.

59.     Denies the allegations in paragraph 59 of the Amended Complaint.

## COUNT II

### AGAINST YORK-JERSEY BASED ON ITS
### ALTER EGO, SINGLE EMPLOYER, JOINT EMPLOYER
### AND/OR DOUBLE BREASTED RELATIONSHIP WITH LETICIA

60. In response to the allegations in paragraph 60 of the Amended Complaint, Leticia repeats and realleges its responses 1 through 59 of the Amended Complaint, as set forth above, as if same were fully set forth herein.

61. Denies the allegations in paragraph 61 of the Amended Complaint.

## COUNT III

### AGAINST THE DEFENDANTS BASED ON THE
### DEFENDANTS' FAILURE TO SUBMIT TO A COMPETE AUDIT

62. In response to the allegations in paragraph 62 of the Amended Complaint, Leticia repeats and realleges its responses 1 through 61 of the Amended Complaint, as set forth above, as if same were fully set forth herein.

63. Denies the allegations in paragraph 63 of the Amended Complaint.

64. Denies the allegations in paragraph 64 of the Amended Complaint.

65. Denies having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 65 of the Amended Complaint, noting again that Leticia has requested of the Trustees but has not been provided with a copy of the Trust Agreement.

66. Denies having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 66 of the Amended Complaint, noting again that Leticia has requested of the Trustees but has not been provided with a copy of the Trust Agreement.

67. Denies the allegations in paragraph 67 of the Amended Complaint.

68. Denies the allegations in paragraph 68 of the Amended Complaint.

## LETICIA'S DEFENSES TO PLAINTIFF'S CLAIMS

### FIRST AFFIRMATIVE DEFENSE

69.     The Amended Complaint fails to state a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

70.     To the extent the Amended Complaint seeks contributions for a period more than six (6) years prior to the commencement of this action, the claim is barred by the applicable statute of limitations.

### THIRD AFFIRMATIVE DEFENSE

71.     Plaintiffs' claims are barred by the doctrine of laches.

### FOURTH AFFIRMATIVE DEFENSE

72.     Plaintiffs' claims are barred by the doctrine of waiver.

### FIFTH AFFIRMATIVE DEFENSE

73.     Plaintiffs' claims are barred by the doctrine of equitable estoppel and/or collateral estoppel.

### SIXTH AFFIRMATIVE DEFENSE

74.     Plaintiffs' claims are barred by the doctrine of unclean hands.

### SEVENTH AFFIRMATIVE DEFENSE

75.     To the extent Plaintiff seeks to hold Leticia vicariously liable for the purported delinquencies of York-Jersey and to that end relies on Section 30 of the MTA CBA, Plaintiff's claims are barred by Section 8(e) of the National Labor Relations Act, 29 U.S.C. § 156, which renders void and unenforceable any provision of a collective bargaining agreement that is therein proscribed and is commonly referred to as a "hot cargo" clause.

## EIGHTH AFFIRMATIVE DEFENSE

76.     Plaintiffs' claims are barred because of their arbitrary, capricious and bad faith behavior.

## NINTH AFFIRMATIVE DEFENSE

77.     Plaintiffs' claims are barred because Leticia made all payment to the Funds as required by the MTA CBA.

## TENTH AFFIRMATIVE DEFENSE

78.     Plaintiffs' claims are barred to the extent they would require Leticia to make contributions that are prohibited under Section 302(a) of the Labor Management Relations Act, 1947, 29 U.S.C. § 186(a).

## ELEVENTH AFFIRMATIVE DEFENSE

79.     Plaintiffs have not met the requirements to legally accept a contribution from an employer under the Labor Management Relations Act § 302(c)(5)(A) and/or § 302(c)(5)(B).

## TWELFTH AFFIRMATIVE DEFENSE

80.     The Amended Complaint fails to satisfy the requisite particularity required by Rule 9 of the Federal Rules of Civil Procedure.

## THIRTEENTH AFFIRMATIVE DEFENSE

81.     Plaintiffs' claims are barred, in whole or in part, because Plaintiffs are unable to establish that the MTA CBA is applicable to employees of York-Jersey.

## FOURTEENTH AFFIRMATIVE DEFENSE

82.     In purporting to apply to Leticia and York-Jersey the Trust Agreement and the administrative rules promulgated thereunder, Plaintiffs have acted in a manner that is arbitrary and capricious and in bad faith and, consequently are precluded from obtaining any of the relief

sought and may not be awarded attorneys' fees, costs, interest, liquidated damages, audit expenses, or any other legal or equitable relief requested in the Amended Complaint.

## LETICIA'S COUNTERCLAIMS

### INTRODUCTION

The Counterclaims asserted herein are by Leticia for injunctive relief and damages against the Counterclaim Defendants ("CDs") for imposing on Leticia discriminatory and onerous labor contract requirements with the purpose and effect of impeding Leticia's business, making the cost of continuing to do business prohibitively expensive and burdensome, and, nearly driving Leticia out of business because of her Hispanic race and gender. Further, this is an action for prima facie tort, tortious interference with contract, and tortious interference with prospective economic advantage against Thomas Gesualdi, Louis Bisignano, Anthony Pirozzi, Anthony D'Aquila, Dominick Marrocco, and William Maye.

### JURISDICTION AND VENUE

83.     The Court has jurisdiction over the federal questions raised in Leticia's counterclaims pursuant to 28 U.S.C. §1331 and 42 U.S.C. §1981. The Court also has jurisdiction over Leticia's counterclaims pursuant to 28 U.S.C. §1367 (a) because the claims set forth herein are inextricably related to the claims in the Amended Complaint and they form part of the same case or controversy.

84.     Leticia brings this action pursuant to Rule 13, Rule 19 and Rule 20 of the Federal Rules of Civil Procedure.

85.     The Court has jurisdiction of this action under 28 U.S.C. §§1331 and under Section 303(b) of the NLRA, 29 U.S.C. §187(b), and it has supplemental jurisdiction of state-law claims hereinafter asserted under to 28 U.S.C. §1367(a).

16

86.     Venue lies in this district under 28 U.S.C. §1391(b)(2), because a substantial part of the events or omissions giving rise to the claims occurred in the Judicial District of the Eastern District of New York.

## FACTUAL BASIS FOR THE CLAIM

### PARTIES

87.     Leticia is a New Jersey corporation engaged in providing truck transportation services for the removal of "excavation trucking") principally in the City and County of New York, New York, with its principal office and place of business at 640 Irvington Avenue, Hillside, New Jersey 07205.

88.     Leticia is, and at all relevant times has been, wholly owned and operated by Leticia Rojas.

89.     Ms. Rojas is a natural person, a citizen of the United States, and a woman of Hispanic descent and ethnicity.

90.     Plaintiff Fund Trustees Joseph A. Ferrarra, Sr., Frank H. Finkel, Marc Herbst, Thomas N. Piali, Denise Richardson, Anthony D'Aquila, Thomas Gesualdi, Louis Bisignano, Dominick Marrocco, and Anthony Pirozzi, on information and belief, are not Hispanic.

91.     The Plaintiff Fund Trustees are comprised half by employer representatives Joseph A Ferrara, Sr., Frank H. Finkel, Marc Herbst, Thomas N. Piali, and Denise Richardson (hereinafter "Employer Representative Trustees") On information and belief, the Employer Representative Trustees are not Hispanic.

92.     The Plaintiff Fund Trustees are also comprised half by union representatives Thomas Gesualdi, Louis Bisignano, Anthony D'Aquila, Dominick Marrocco, and Anthony Pirozzi (hereinafter "Union Representative Trustees").

17

93.     Counterclaim Defendants Anthony D'Aquila, Thomas Gesualdi, Louis Bisignano, Dominick Marrocco, and Anthony Pirozzi, are officers or agents of Local 282 and are its designated trustees and fiduciaries for the Local 282 Funds.

94.     Counterclaim Defendant (hereinafter "CD") Local 282 is a labor organization within the meaning of section 2(5) of the NLRA, 29 U.S.C. § 152(5), that maintains its principal office and place of business at 2500 Marcus Avenue, Lake Success, New York 11042.

95.     CD THOMAS GESUALDI is, and at relevant times has been, the President of Local 282. Upon information and belief, Mr. Gesualdi is a white male of Italian national origin.

96.     CD LOUIS BISIGNANO is, and at all relevant times has been, the Secretary Treasurer of Local 282. Upon information and belief, Mr. Bisignano is a white male of Italian national origin.

97.     CD ANTHONY PIROZZI is, and at all relevant times has been, the Vice President of Local 282. Upon information and belief, Mr. Pirozzi is a white male of Italian national origin.

98.     CD ANTHONY D'AQUILA is, and all relevant times has been, either the Recording Secretary or a Business Agent of Local 282. Upon information and belief, Mr. D'Aquila is a white male of Italian national origin.

99.     CD DOMINICK MARROCCO is, and at all relevant times has been, a Business Agent of Local 282. Upon information and belief, Mr. Marrocco is a white male of Italian national origin.

100.    Upon information and belief, the actions complained of in this action were taken by the Union Representative Trustees with respect to Leticia in their capacities as union officials and as trustees of the Funds, and also in their individual capacities.

101.    CD WILLIAM MAYE is, and at all relevant times has been, the Manager or Administrator of each Local 282 Funds and, in that capacity, has had actual, implied or apparent authority to take official action on the Funds' behalf without prior express authorization of the Fund's board of trustees. Upon information and belief, Mr. Maye is a white male of non-Hispanic racial origin or affiliation.

102.    In their dealings with Leticia, the Counterclaim Defendants have administered the Local 282 Funds arbitrarily, capriciously and in bad faith for the purpose of imposing on Leticia noncompetitive wage rates as compared to other employers in the excavation trucking industry in New York City with the ultimate objective of driving Leticia out of business by making the cost of doing business prohibitively expensive.

103.    Counterclaim Defendants have engaged in this lawless behavior on behalf of, in active concert with, and as agents for Local 282 because Leticia is owned and operated by an Hispanic woman.

104.    Counterclaim Defendants have so dominated and controlled the Local 282 Funds so as to make them the instruments of their wrongful and discriminatory schemes.

105.    As will be specified in more detail below, Counterclaim Defendants' unlawful scheme was implemented through a combination of arbitrary and discriminatory actions carried out by all Counterclaim Defendants  purporting to discharge their official duties and, included, among other things: (1) discriminatory enforcement of purported "key-to-key" pay requirements only against Leticia; (2) refusal to provide Leticia with a  letter of good standing whenever same was a prerequisite for successfully bidding on available job opportunities notwithstanding, upon information and belief, their willingness to do so for other employers who were blatantly and notoriously non-compliant with purported contractual requirements that were being imposed on

19

Leticia; (3) conducting audits of Leticia's books and records with greater frequency than is the case with other favored non-Hispanic employers; (4) purposely inflating the amount of contribution deficiencies purportedly discovered by the audits, and doing so with full knowledge that the purported contractual basis for the asserted deficiencies was not supported and could not be supported by the MTA CBA or any plausible or industry-recognized construction of it; (5) arbitrarily and capriciously and in bad faith relying upon grossly inaccurate and deliberately manipulated On Site Steward Reports ("OSS Reports") to justify inflated audit results, while disregarding Leticia's honest, certified payroll records that were never challenged in any proper or legitimate manner; (6) arbitrarily and capriciously and in bad faith insisting upon and conducting audits of other legal entities owned by Leticia Rojas and/or her husband even though the Counterclaim Defendants and the responsible Fund officials, knew or, in the exercise of reasonable diligence, would have known those other entities employed no truck drivers and were neither party to nor liable under the MTA CBA or any other collective bargaining agreement with Local 282; and (7) by arbitrarily and capriciously and in bad faith seeking to impose liability upon Leticia for the purported work of employees employed by York-Jersey, a separate and distinct entity that is neither a single, joint, alter ego nor double breasted operation in relation to Leticia.

106.    Upon information and belief, the foregoing schemes were designed to increase Leticia's operating costs and thereby make her wage costs noncompetitive as compare with other similarly situated trucking companies that were also bound by the MTA CBA and otherwise similarly situated to Leticia in all material respects but were not owned and operated by an Hispanic woman, and were implemented with discriminatory intent and to give a competitive advantage to Leticia's competing employers who were not owned by a Hispanic woman.

107.     Upon information and belief, ultimately the foregoing schemes were designed by Local 282's officers and agents and the Fund using the Local 282 Funds as the instrumentality to cripple Leticia to the point of destruction because of Leticia's Hispanic race.

108.     The disparate enforcement of the purported rules and regulations of the Local 282 Funds, as herein described, served no legitimate objective of the Local 282 Funds and were, in fact, harmful to the Local 282 Funds' beneficiaries because by their disproportionate and discriminatory attention to the purported deficiencies of Leticia, other employers were allowed to evade – indeed, protected in their violation of – their actual obligation to make benefit contributions for the benefit of their own employees, who were far greater in numbers than the Local 282 members employed by Leticia.

## Interrelationships of the Parties

*The Governing Labor Agreements:*

109.     Leticia is a member of the Metropolitan Trucker's Association ("MTA"), a multi-employer association or representative that negotiates a collective bargaining agreement with Local 282 on behalf of the MTA and its members, including Leticia.

110.     The Union Representative Trustees are, and at all relevant times has been, both officers and agents of Local 282 and simultaneously trustees of the Local 282 Funds, specifically, Thomas Gesualdi, Louis Bisignanno, Dominick Marrocco, Anthony Pirozzi and Anthony D'Aquila.

111.     Since on or about May 25, 1998, and continuing to this date, Leticia has been a party to a series of collective bargaining agreements with Local 282 (collectively, the "CBAs"). The most recent CBA between Leticia and Local 282 is the July 1, 2009 through June 30, 2012 Metropolitan Trucker's Association & Independent Trucker's Contract (the "MTA CBA").

112. At all times relevant to this action, the CBAs have required employers that are parties thereto to make contributions to the Local 282 Funds on behalf of their covered employees, for covered work, at specified hourly rates, subject to certain limitations and premium payments which are set forth therein.

113. The CBAs bind signatory employers to a Trust Agreement or Agreements that establish and govern the administration of the Local 282 Funds.

114. Upon information and belief, the Trust Agreement(s) authorize the funds to audit signatory employers from time to time in order to verify that all contributions required under the CBAs have been remitted to the Funds, that such contributions have been made solely on behalf of individuals eligible to participate in the Funds, and that covered employees who perform covered work are receiving the required benefits and/or credits.

*Counterclaim Defendants' Relationship with Other Employers:*

115. Upon information and belief, the Fund Trustees, Local 282, its officers Thomas Gesualdi, Louis Bisignano, Dominick Marrocco, Anthony Pirozzi, Anthony D'Aquila (hereinafter "Union Officers") have personal relationships with the owners or managers of many employers other than Leticia that are members of the MTA and parties to the MTA CBA and its predecessor agreements, and as a consequence, such other employers are treated more favorably by the Local 282, the Union Officers, and the Fund Trustees than Leticia in that they are allowed to pay wages to their employees and make contributions to the Funds that are at lesser amounts than what is required by Leticia under the purported interpretation of the MTA CBA and its predecessor agreements.

116.    As a consequence of their preferred treatment, the Favored Employers enjoy a competitive economic advantage that enables them to underbid Leticia for excavation trucking contracts in and about New York City.

117.    Upon information and belief, none of the Favored Employers is owned and operated by a Hispanic woman.

*Agency Relationship Between the Funds and the Union:*

118.    At all times relevant to this action, the Local 282 Funds are and have been controlled and dominated by the Union, through the actions of its Union Officers, the Union Trustees and of CD Maye, acting as agents of the Union and without regard to their fiduciary duties to the Local 282 Funds.

119.    The Local 282 Funds maintain their offices at 2500 Marcus Avenue, Lake Success, New York, 11042, in space that is shared with the Union and its Union Officers Thomas Gesuardi, Louis Bisignano, Anthony Pirozzi, Anthony D'Aquila, and Dominick Marrocco.

120.    At all times relevant to this action, persons serving as president, secretary-treasurer, vice president and recording-secretary of the Union have simultaneously served as Union-designated trustees of the Funds and did so solely by virtue of their official positions with the Union. At no time relevant to this action has there been a Union-designated trustee of the Funds who was not simultaneously serving as an officer of the Union.

121.    All official activities undertaken by the Fund Trustees purportedly in their capacity as trustees of the Fund were conducted in or from offices occupied by them at the Union's headquarters at 2500 Marcus Avenue, Lake Success, New York 11042.

122.    The Local 282 Funds receive employee benefit contributions from, and only from, employers who are party to a Local 282 labor agreement or are alleged by the Union to be affiliated with such an employer as a single, joint, successor or alter-ego employer.

123.    Legal counsel retained by the Funds is the same legal counsel as is retained by Local 282 and, more particularly, upon information and belief, the same lawyers within the law firm have advised and counseled the Union, its officials and the Funds, simultaneously, concerning their common, ungrounded, discriminatory based assertions that Leticia has not complied with the MTA CBA and its predecessor agreements with respect to its compensation of and benefit contributions made on behalf of Leticia's employees who are represented by Local 282.

124.    Upon information and belief, at numerous times since 2005, the law firm representing the Funds has made communications to one or more of the Union Representative Trustees, in their dual capacity as Union agents and purported fiduciaries to the Funds, concerning Leticia's compensation practices and benefit-fund contributions that were not simultaneously made or disclosed to the employer-selected trustees of the Local 282 Funds.

125.    Upon information and belief, at numerous times since 2005, CD Maye made communications to one or more of the Union Representative Trustees, in their dual capacity as Union Officers and purported fiduciaries to the Funds, concerning Leticia's compensation practices and benefit-fund contributions that were not simultaneously made or disclosed to the employer-selected trustees of the Local 282 Funds.

126.    With respect to the material conduct hereinafter alleged, the Funds' actions were intertwined with those of the Union, and the Funds and the Union Representative Trustees injected themselves into the collective bargaining process by taking the Union's side in its

dispute with Leticia, by adopting the Union's bargaining objectives, and by unilaterally imposing those objectives on Leticia.

127.    Upon information and belief, with respect to each action taken by the Funds concerning Leticia, as is hereinafter alleged, CD Maye exercised his authority as Funds Manager or Administrator at the behest of and in concert with the Union Representative Trustees the Union Officers (Thomas Gesualdi, Louis Bisignano, Anthony D'Aquila, Anthony Pirozzi, Dominick Marrocco) and for the purpose of advancing the Union's principal interests, goals and objectives with respect to Leticia and without regard to the interests of the Funds' beneficiaries.

128.    Upon information and belief, CDs D'Aquila and Gesualdi, acting in dual capacities as both Union officers and Union-designated trustees of the Funds, refused to investigate conduct of other employers, including Favored Employers, who were not paying their drivers or making benefit contributions on behalf of their drivers in the manner required of Leticia under the Union's purported interpretation of the MTA CBA and its predecessor agreements, even after the existence of such non-compliance was specifically reported to them not only by Leticia but also by members of Local 282. On information and belief, none of these other employers were owned and operated by a Hispanic woman.

129.    Upon information and belief, by virtue of facts known to CDs D'Aquila and Gesualdi, to the other Union Representative Trustees, Union Officers, and to the legal counsel common to the Funds and the Union, the Funds knew, or, in the exercise of reasonable diligence, should have known that other employers bound by the MTA CBA and its predecessor agreements—either as signatories or as affiliated with signatories as single, joint, successor, or alter-ego employers—including the Favored Employers, were not making benefit fund contributions that were required by the interpretation of the MTA CBA and its predecessor

agreements that the Funds wrongfully and discriminatorily applied to Leticia because of its Hispanic ownership.

130.    Despite actual or constructive knowledge of such non-compliance by other non-Hispanic employers bound by the MTA CBA and its predecessor agreements, the Funds did not timely demand from such other employers benefit fund contributions commensurate with those demanded of Leticia and did not as vigorously assert their audit and other rights under the Trust Agreements as they did with respect to Leticia.

131.    The Funds did not undertake an impartial, good-faith investigation of the matters alleged when conducting audits of Leticia's payrolls or assessing alleged contribution deficiencies of Leticia, but rather uncritically accepted and relied upon Union-controlled sources of information, such as the OSS reports (as hereinafter defined) that they knew or, in the exercise of reasonable diligence, should have known were false and overstated and, in some instances, the Funds even refused to credit information favorable to Leticia that was contained in the independent audit reports prepared for the Funds and at their direction.

132.    Upon information and belief, and as is alleged more particularly hereinafter, the Funds failed and refused to issue on Leticia's behalf Letters of Good Standing even though its benefit-fund contributions were calculated and made in the same manner as other employers bound by the MTA CBA and its predecessor agreements, including the Union-Favored Employers, that were not owned and operated by an Hispanic woman, and the Funds never refused to issue Letters of Good Standing for such other employers who were similarly situated to Leticia in all material respects.

## Discriminatory Treatment of Leticia

133.    Upon information and belief, the foregoing schemes were designed to increase Leticia's operating costs and thereby make it noncompetitive, and they were implemented in order to discriminate against Leticia because of Leticia Rojas' Hispanic race and to give a competitive advantage to other employers who were not Hispanic or female.

*Key-to-Key Pay Requirement:*

134.    Prior to in or about mid-2007, the pay provisions of the CBAs were administered so as to require employers to pay only for time when the drivers were transporting excavated material, and not for down time, *e.g.,* time when the drivers were traveling between the yard where the trucks were parked and their first and last assignments of the day and not actually transporting excavated material.

135.    In or about mid-2007, CD Anthony D'Aquila, as a Local 282 Business Agent and on behalf of Local 282, deliberately misinformed a government-approved monitor who had been assigned to Leticia in connection with its work on the World Trade Center site, by stating untruthfully that the CBAs required that Leticia pay its drivers for all time from the time that they got into their trucks in the morning and turned them on until returned to the yard at the end of the day and turned them off. This was in fact a unilateral and arbitrary change in the Union's administration of the CBAs, and was in direct conflict with the written terms of the MTA CBA and well established industry practice, in that it required Leticia to pay its drivers for down time in addition to the time they were actually transporting excavated material.

136.    Mr. D'Aquila and Local 282's deliberate misstatements concerning Leticia's contractual pay obligations to the monitor supervising Leticia's operations in connection with the World Trade Center project, was reiterated in a letter from Mr. D'Aquila to Leticia on or about

November 20, 2007 ("November 20 Letter"), in which Mr. D'Aquila repeated the erroneous and unfounded assertion that the Local 282 drivers had to be paid for all of their time in the truck "from the minute they get in their truck," a requirement generally referred to as the "key-to-key" rule.

137.    In response to Mr. D'Aquila's November 20 Letter, Leticia specifically advised Mr. D'Aquila and Local 282 that the purported "key-to-key" rule was not actually being applied to other employers operating under the MTA CBA and, in fact, was not required by the MTA CBA.

138.    In a meeting between Mr. D'Aquila on behalf of CDs and Leticia Rojas, and their respective counsel, on or about January 15, 2008, Ms. Rojas continued to object that Local 282 was not enforcing the purported "key-to-key" requirement with respect to any other employers and specifically identified Fusella Trucking, owned upon information and belief by a non-Hispanic, as one of her competitors working under the MTA CBA that was not paying its drivers on a "key-to-key" basis ("January 15 Meeting").

139.    At the January 15 Meeting, Ms. Rojas also advised Mr. D'Aquila that she had heard that Fusella was also paying its drivers in cash, in whole or in part.

140.    Also at the January 15 Meeting, Ms. Rojas asked Mr. D'Aquila if he or Local 282 had sent a letter to Fusella and all of the other signatories to the MTA CBA similar to the November 20, 2007 letter that Mr. D'Aquila had sent to Leticia on behalf of Local 282.

141.    Mr. D'Aquila refused to answer Ms. Rojas' question, and, evading the reasonable and legitimate inquiry, told her dismissively not to tell Local 282 how to run its business.

142.    Since January 15, 2008, Mr. D'Aquila, and through him all other Counterclaim Defendants, know, or were on notice of the fact, that Fusella Trucking did not pay wages or

make benefit contributions for the travel time of its employees – indeed that they were not paying or making fund contributions for all working time.

143.     Following the January 15 Meeting, Ms. Rojas continued to complain to Messrs. D'Aquila and Gesualdi, the Local 282 President, about the fact that, to the best of her knowledge, none of Leticia's competitors who were signatory to the MTA CBA were paying their drivers in accordance with the purported "key-to-key" requirement that the Union was arbitrarily and maliciously imposing on Leticia.

144.     Additional evidence that Ms. Rojas' complaints were founded arose in a disciplinary arbitration hearing concerning one of Leticia's employees, Rafael Becerra, on or about February 6, 2008, when Mr. Becerra testified under oath in the presence of Mr. D'Aquila that he was then working for Tri-State Solutions, and that Tri-State was not paying him from the time he got into his truck in the morning, but rather only from the time after he had driven to and arrived at his first destination to pick up his first load for the day. Upon information and belief, Tri-State, like Leticia, is bound by the MTA CBA, but unlike Leticia is not owned and operated by a Hispanic woman.

145.     Although Mr. D'Aquila was thus aware that Tri-State was not observing the purported "key-to-key" requirement, neither he nor anyone else from Local 282 did anything to correct Tri-State's pay practices, as Mr. Becerra testified under oath a few weeks later in the presence of Mr. D'Aquila when the arbitration hearing resumed.

146.     Current President of Local 282 and Union Trustee Thomas Gesualdi reiterated the purported "key-to-key" contractual obligation personally to Leticia Rojas in a grievance panel meeting on or about October 8, 2008.

*Frequency of Audits:*

147.    Leticia is audited by the Funds, as a result of false information provided by Local 282 Trustees, more than other employers working under the MTA CBA who are non-Hispanic.

148.    Leticia has been audited by the Funds as directed by Local 282, its Union Officers (Thomas Gesualdi, Anthony D'Aquila, Anthony Pirozzi, Louis Bisignano, Dominick Marrocco) and the Union Representative  Trustees, at least once each year since 1998, and often has had unresolved audits pending at the same time.

149.    Other trucking companies that are not Hispanically-owned go years without having an audit, including, for example, companies known as: "Happy Time Trucking, LLC a/k/a Happy Time Trucking, Inc. a/k/a Happy Time Trucking II LLC;" "Juda Construction, LTD;" "Pure Earth Materials, Inc. a/a/ South Jersey Development, Inc.;" "Pure Earth Transportation and Disposal, Inc.;" "PEI Disposal Group a/k/a Pure Earth Disposal Group, Inc.;" "Rainbow Transport Corporation;" "T.E.V. Corp. a/k/a TEV Corp.;" and "Whitney Trucking, Inc."

*Unsupported and Inflated Audit Claims:*

150.    The Funds' audits of Leticia repeatedly lead to false claims for purportedly unpaid Fund contributions, requiring that Leticia object to the audit and disprove each and every one of the unfounded and exaggerated claims. Local 282, the Union Officers Thomas Gesualdi, Anthony D'Aquila, Anthony Pirozzi, Dominick Marrocco, Louis Bisignano, and Union Representative Trustees provided false information to the Funds, who uncritically accepted and relied on such false information—information to the Funds knew or should have known to be false—to audit Leticia an excessive number of times and to assess purported delinquent contributions that are wholly unconnected to the actual requirements of the CBAs.

30

151.   At all times, CD Maye knew, or should have known, that the claims and assessments being made against Leticia for purported delinquent contributions were not at all warranted by the industry practice or any fair reading of the CBAs, and he repeatedly failed or refused to assert on behalf of the Funds such claims and assessments against the Union-Favored Employers, none of which was Hispanically-owned.

152.   The bogus audit claims asserted against Leticia have regularly included four types of fraudulent discrepancies with the encouragement and approval of the CDs" (a) claims for individuals who have never worked for Leticia, (b) claims for individuals who did not work for Leticia during the audit period, (c) claims for individuals who worked during the audit period, but not at all in a given month for which contributions are claimed, and (d) claims for individuals who worked for Leticia during the audit period, but who did not work the hours being claimed.

153.   Even after Leticia objected to and demonstrated the errors of such claims, the Funds have reduced but never eliminated them, and always without specifically addressing the details of Leticia's objections or explaining the basis for the partial reductions despite repeated requests for same by Leticia. That, in turn, imposed on Leticia the additional time-consuming task of having to reverse-engineer that revised audit reports in an effort to determine if and how the Funds addressed its objections. This, like the original audits themselves, is time consuming and costly in connection with the diversion of Leticia's resources from its primary mission of providing excavation trucking services. The Funds knew the information provided by Local 282 and the Union Officers and Union Representative Trustees was false, and the Funds acted as agents of the Union in discriminating against Leticia because it is a company owned and operated by a Hispanic female.

154.    The Funds have repeatedly failed and refused, even to this day, to provide Leticia with a copy of the applicable Trust Agreement(s) and with the documentary support requested by Leticia to justify the audit claims and the revised and adjusted audit claims.

155.    In all of the aforementioned ways, the Funds acted at the behest of and in concert with the Union, its Union Officers and  Union Representative Trustees, and treated Leticia in ways they did not treat other signatories to the CBAs, including the Union-Favored Employers, that are not Hispanically owned and operated.

*On Site Steward Reports:*

156.    Upon information and belief, Local 282 On Site Stewards ("OSS") located on the worksites at issue in this action have been directed by the Union, Union Officers and  Union Representative Trustees to falsely report that truck drivers actually working for other employers on any given day are working for Leticia, thereby creating the appearance of an obligation on the part of Leticia for the wages and benefits of the employees of other employers that are not Hispanically owned.

157.    Repeatedly Leticia has demonstrated to the Funds and their agents that such OSS reports are unreliable and false by, for example, repeatedly attributing to Leticia's employment numerous individuals who have never worked a day in their lives for Leticia.

158.    As agents of Local 282, its Union Officers and the Union Representative Trustees, the Funds further this unlawful tactic by submitting the false OSS reports to the outside auditors, portraying them as accurate, when they know they are not, thereby causing the auditors to "find" that Leticia owes delinquent contributions to the Funds for other employers' workers.

159.    Notwithstanding the repeatedly demonstrated unreliability of the OSS reports, the Funds' arbitrary and capricious position, maintained in bad faith, is that the OSS reports

supersede Leticia's certified payrolls, and, therefore, if there is a discrepancy between the OSS reports and Leticia's certified payrolls, the OSS reports govern, unless Leticia's certified payrolls happen to be more favorable to the Funds, in which case the Funds will adopt Leticia's payroll records.

*Letter of Good Standing:*

160.    Another device arbitrarily and capriciously used by the Funds, Local 282, Union Officers  and the Union Representative Trustees in bad faith to hurt Leticia's competitive position and business relationships and opportunities, is the Letter of Good Standing ("LGS"). The Funds refuse to provide such LGS to potential customers of Leticia without requiring prerequisites from Leticia that, upon information and belief, exceed those demanded of other employer signatories to the CBAs that are not Hispanically owned.

161.    Notwithstanding the fact that Leticia has for many years been prompt in its payment of Fund contributions, the Funds unreasonably and for discriminatory purposes, at the behest of and in concert with Local 282, the Union Officers, and Union Representative Trustees created unannounced and undefined obstacles to Leticia's attainment of a LGS from the Funds.

162.    The refusal by the Funds to provide Leticia with a LGS in a timely manner when needed by Leticia in order to qualify for job opportunities has prevented Leticia from obtaining work, including without limitation, work with Urban Foundation.

163.    The refusal by the Funds was to provide Leticia with a LGS when needed by Leticia in order to qualify for job opportunities was undertaken solely to advance the principal interests of the Union in imposing on Leticia the purported "key-to-key" requirement, and not for any legitimate purpose of the Funds themselves or their participants and beneficiaries.

*Unreasonable, Arbitrary and Capricious Audit Demands of "Affiliated Entities":*

164.     In its relentless efforts to overburden Leticia with costly, time consuming work that diverts its attention from its primary mission at considerable expense, the Funds, Local 282, the Union Officers and Union Representative Trustees arbitrarily, capriciously and in bad faith demand audits of non-signatory entities in which Leticia Rojas and/or her husband have ownership interests even though they may provide no trucking services of any kind and/or do not employ any truck drivers, and in some cases do not even employ any employees.

## AS AND FOR A FIRST CLAIM FOR RELIEF AGAINST ALL COUNTERCLAIM DEFENDANTS

### (42 U.S.C. §1981 – Race Discrimination)

165.     Leticia repeats and realleges the allegations in paragraphs 1 through 164 of this Second Amended Answer and Counterclaim as if fully set forth herein.

166.     At all times relevant to the action, the sole shareholder and owner of Leticia has been a natural person named Leticia Rojas.

167.     Ms. Rojas is a citizen of the United States and a woman of Hispanic descent and ethnicity.

168.     Leticia is a certified minority-owned business enterprise that is, and at all relevant times has been, the only qualified Hispanic-owned trucking firm legitimately operating under the MTA CBA for excavation trucking.

169.     Counterclaim Defendants Anthony D'Aquila, Thomas Gesualdi, Louis Bisignano, Dominick Marrocco and Anthony Pirozzi are, and at all relevant times have been, both officers and agents of Local 282 and simultaneously trustees of the Local 282 Funds.

170. William Maye is, and at all relevant times has been, the Fund Administrator of the Local 282 Funds and has acted in active concert with the Union Plaintiffs to plan, implement, and carry out the covert scheme of anti-Hispanic discrimination as hereinafter alleged.

171. At all times relevant to this action, Thomas Gesualdi, Louis Bisignano, Dominick Marrocco, Anthony D'Aquila and Anthony Pirozzi, while ostensibly acting in furtherance of the legitimate purposes of the Local 282 Funds, have purposefully, deliberately and with conscious awareness of their wrongdoing used and abused their positions of authority to cause the Local 282 Funds to impose on Leticia economically onerous interpretations and applications of the MTA CBA that were neither required by the terms of that agreement, nor consistent with historical custom and practice in the industry, nor demanded of other non-Hispanically-owned companies in the excavation trucking industry in New York City, and they have done so on behalf of and as agents for the Union and in furtherance of its intention to discriminate against Leticia because it is an Hispanically-owned business.

172. At all times relevant to this action, Leticia has fully complied with the wage and benefit provisions of the MTA CBA as written and as historically applied by the Union to employers in the excavation trucking industry in New York City.

173. At all times relevant to this action, Thomas Gesualdi, Louis Bisignano, Dominick Marrocco, Anthony D'Aquila, and Anthony Pirozzi and each one of them, knew or in the exercise of reasonable diligence should have known, that Leticia had fully complied with the wage and benefit fund provisions of the MTA CBA as written and as historically applied by the Union to employers in the excavation trucking industry in New York City that are party to or bound by that agreement and otherwise similarly situated to Leticia in all material respects.

174.   The MTA CBA expressly provides that contributions to the Local 282 pension and welfare funds are to be based on hours worked by employees and, in stark contrast, that contributions to the Local 282 annuity, vacation and training funds are to be based on hours paid to employees.

175.   The MTA CBA expressly defines "hours worked" to include certain paid non-working time, such as holidays and vacation, but, by implication, necessarily excludes other non-working time (whether paid or unpaid), such as an employee's time spent traveling from the employer's truck depot to the site of construction and from the site at which excavated material and refuse may be lawfully deposited back to the employer's truck depot, all such time being hereinafter referred to as "travel time."

176.   Since in or about November 2007, and continuously through this date, Local 282, through its officers, agents, and allied parties, has embarked on a plan to economically harass and undermine the business of Leticia because it is an Hispanically owned enterprise by imposing on it economically onerous interpretations and constructions of the MTA CBA that it deliberately chose not to impose on other, non-Hispanically owned companies in the construction excavation trucking industry in New York City that are subject to and bound by the MTA CBA and otherwise similarly situated to Leticia in all material respects.

177.   In furtherance of its unlawful and discriminatory scheme, Local 282 has, since at least November 2007 and continuously through this date, demanded and required that Leticia pay its union-represented drivers not less than their full and regular hourly rate for non-working travel time, notwithstanding that the payment of wages for all such time is not required by the MTA CBA, was not consistent with historical custom and practice in the industry, and was not demanded or required of non-Hispanically owned trucking companies in the excavation trucking

industry of New York City that are subject to and bound by the MTA CBA and otherwise similarly situated to Defendant Leticia in all material respects.

178.  At no time did the Union demand arbitration under the MTA CBA either to enforce its purported interpretation of the MTA CBA or to establish the correctness of its purported interpretation of the MTA CBA, but rather used the Union Officers and Union Representative Trustees to cause the Local 282 Funds to impose on Leticia the Union's erroneous, ungrounded, unilaterally-imposed and discriminatory interpretation of MTA CBA by threatening to hold Leticia to be delinquent in its Fund contribution obligations, and, therefore, ineligible for a LGS unless it acquiesced in and capitulated to the Union's demands.

179.  The Union Representative Trustees, and each one of them, in active concert with and as officers of the Union, and for the conscious and deliberate purpose and intent of discriminating against Leticia because it is a Hispanically-owned enterprise, cause the Local 282 pension and welfare funds to demand – and such funds did in fact demand and collect – from Leticia benefit contributions based on all paid hours, including the non-working travel time, that Leticia was wrongfully coerced by the Union to pay its employees, notwithstanding that the MTA CBA, in pertinent part, required Fund contributions to be made to such funds only on the basis of hours worked and not on the basis of hours paid.

180.  The Union Representative Trustees, and each one of them, in active concert with officers of the Union, and for the conscious and deliberate purpose and intent of discriminating against Leticia because it is an Hispanically-owned enterprise, caused the Local 282 Funds to repeatedly audit the books and records of Leticia, when it was not auditing the books of Leticia's competitors that were not Hispanically owned.

181.    The Funds did, in fact, conduct such audits and purportedly, on the basis of such audits, asserted the existence of benefit contribution delinquencies and deficiencies because contributions to the Local 282 pension and benefit funds had not been paid on non-working travel time, notwithstanding that the MTA CBA, in pertinent part, required benefit contributions to be made to such funds only on the basis of hours worked and not on the basis of hours paid.

182.    The Union Representative Trustees did not cause any of the Local 282 Funds to demand and compel – and the Local 282 Funds did not demand or compel – any other, non-Hispanically owned companies in the excavation trucking industry in New York to make benefit contributions based on paid, but non-working travel time during the periods of time relevant to this action.

183.    The Union, the Union Representative Trustees, and Union Officers did not, during the periods of time relevant to this action, cause any of the Local 282 Funds to audit on a regular basis the books and records of certain other non-Hispanically owned companies in the excavation trucking industry in New York City that are also subject to and bound by the MTA CBA and otherwise similarly situated to Leticia in all material respects and that do not pay their employees for non-working travel or make benefit fund contributions on the basis of such non-working hours.

184.    The Local 282 Funds did not, during periods of time relevant to this action, assert against or collect from such non-Hispanically owned trucking companies any delinquencies or deficiencies because they had not paid contributions to the Local 282 pension and welfare funds for the non-working travel time of their employees.

185.    At all relevant times, the Union, its Officers and the Union Representative Trustees knew or, in the exercise of reasonable diligence, would have known that the other non-

38

Hispanically owned trucking companies operating under the MTA CBA did not pay wages to their employees for non-working travel time and did not make any benefit fund contributions for their employees for non-working travel time.

186.    The Local 282 Funds, acting as agents of the Union, imposed on Leticia benefit contribution obligations more economically onerous than the obligations imposed on any other trucking company in the excavation trucking industry in New York City because Leticia was an Hispanically-owned company.

187.    In demanding benefit contributions from Leticia that were not demanded from other non-Hispanically owned trucking companies in the excavation trucking industry of New York City that are subject to and bound by the MTA CBA and otherwise similarly situated to Leticia in all material respects, the Local 282 Funds acted arbitrarily, capriciously and in bad faith.

188.    The Union Representative Trustees, Union Officers Thomas Gesualdi, Louis Bisignano, Anthony D'Aquila, Dominick Marrocco, and Anthony Pirozzi, Local 282, and the Funds have acted in concert to plan, implement, and carry out the covert scheme anti-Hispanic discrimination.

189.    The Local 282 and the Union Officers, Union Representative Trustees, and Counterclaim Defendants have applied and enforced the MTA CBA and its predecessor agreements in a discriminatory manner designed to make Leticia noncompetitive with the ultimate objective of driving Leticia out of business by making the cost of doing business prohibitively expensive because of Leticia Roja's Hispanic race.

190.    The Local 282, Union Officers, Union Representative Trustees, and other  CDs unlawful schemes were implemented through a combination of discriminatory actions purportedly carried out in furtherance of their official positions.

191.    The Local 282, its Union Officers, and the Union Representative Trustees and other CDs have, at all times relevant to this matter, discriminatorily enforced the purported "key-to-key" pay requirements against Leticia, but not against other employers who are party to the MTA CBA but not owned and operated by Hispanic women and are otherwise similarly situated to Leticia in all material respects.

192.    The Local 282, its Union Officers, and the Union Representative Trustees and other CDs, have at all times relevant to this action, refuse to provide Leticia with a LGS whenever same was a prerequisite for successfully bidding on available job opportunities, but have provided such letters to other employers bound to the MTA CBA that are not owned and operated by a Hispanic woman and are otherwise similarly situated to Leticia in all material respects.

193.    The Local 282, its Union Officers, and the Union Representative Trustees and other CDs have, at all times relevant to this matter conducted audits of Leticia's books and records with greater frequency than was the case for other employers bound to the MTA CBA that are not owned and operated by a Hispanic woman and are otherwise similarly situated to Leticia in all material respects.

194.    The Funds refused to issue Leticia LGS on a few occasions in connection with pending job opportunities even though Leticia was current in its obligations to the Funds solely because Leticia Rojas is Hispanic.

195.    Upon information and belief, the Funds did not refuse LGS to Leticia's non-Hispanic competitors, even though, in some cases they were delinquent in their Funds contributions.

196.    Because the Funds had, for discriminatory reasons, refused to issue a LGS, Leticia was rejected from and denied the opportunity to enter into contracts to perform truck hauling services for the carting of excavation material from construction sites in New York City, including but not limited to a job with Urban Foundation.

197.    The Local 282 Funds' refusal to provide LGS to Leticia had no justifiable basis and was done with malice in wanton disregard for Leticia's rights with the intention of driving Leticia out of business.

198.    The Local 282, its Union Officers, and the Union Representative Trustees and other CDs have, at all times relevant to this matter purposely inflated the excessive audits with unsupported claims of liability, but have not pursued such unsupported claims of liability with respect to other employers bound to the MTA CBA that are not owned and operated by a Hispanic woman and are otherwise similarly situated to Leticia in all material respects.

199.    The Local 282, its Union Officers, and the Union Representative Trustees and other CDs have, at all times relevant to this matter arbitrarily and capriciously and in bad faith relied upon grossly inaccurate OSS reports to justify inflated audits and disregard Leticia's honest, certified payroll records, and other Leticia business records, but have not done so with respect to other employers bound to the MTA CBA that are not owned and operated by a Hispanic woman and are otherwise similarly situated to Leticia in all material respects.

200.    The Local 282, its Union Officers, and the Union Representative Trustees and other CDs have, at all times relevant to this matter arbitrarily and capriciously and in bad faith

insisted upon conducting audits of other legal entities owned by Leticia Rojas and/or her husband even though they employed no truck drivers and were not party to the MTA CBA or any other collective bargaining agreement with Local 282, while they have declined to make such demands on other employers bound to the MTA CBA that are not owned and operated by a Hispanic woman and are otherwise similarly situated to Leticia in all material respects.

201.    The Local 282, its Union Officers, and the Union Representative Trustees and other CDs have at all relevant times to this matter arbitrarily and capriciously and in bad faith sought to impose liability upon Leticia for the purported work of employees employed by York-Jersey, which is not owned by Leticia Rojas and is a separate and distinct entity that is neither a single, joint, alter ego nor double-breasted operation in relation to Leticia, while it has not done the same against other employers bound to the MTA CBA that are not owned and operated by a Hispanic woman and are otherwise similarly situated to Leticia in all material respects.

202.    Upon information and belief, Leticia Rojas has persistently contacted the Union Officers and CDs to complain about the other non-Hispanic employers' unlawful actions, and the unfairness of their favorable treatment via multiple e-mails, letters and phone conversations, to no avail as CDs have not responded to any of Leticia Rojas' complaints, and by their omissions, they are acting discriminatorily in an effort to drive Leticia, Inc. out of business because its owner is a Hispanic woman.

## SECOND COUNTERCLAIM

### (Prima Facie Tort)

203.    Leticia repeats and realleges each and every allegation contained in Paragraphs 1 through 202, as if set forth herein in their entirety.

42

204.    The Union Representative Trustees and Local 282 Funds' repeated and disproportionate auditing of Leticia's books and records, and the manipulated and distortion of the outcome of those audits to produce false claims, as well as inflated claims based upon the requirement arbitrarily and maliciously imposed on Leticia pay wages and benefit contributions in excess of those required of other employer signatories to the MTA CBA and its predecessor agreements, that were intentional acts intended to, and which did in fact, inflict harm on Leticia, both in the extension of personal resources to respond to the excessive audit inquiries, and in the payment of quantifiable, extra wages and contributions that Leticia would not otherwise have paid, as well as the competitive disadvantage at which such additional costs put Leticia.

205.    As a result of enforcing the "key-to-key" pay obligations against Leticia alone, the Union Representative Trustees, Local 282, and the Local 282 Funds acting on behalf of and as agents for Local 282 intentionally inflicted harm on Leticia by requiring that it pay weekly wages to her employees in excess of what its competitors paid in the industry, without any excuse or justification, resulting in a  quantifiable loss to Leticia measured by the additional cost of the wages and contributions to the Funds Leticia paid to and on behalf of each employee since the imposition of the purported "key-to-key" contractual pay obligations.

206.    The Local 282 Funds' refusal to issue the LGS to Leticia in connection with the Urban Foundation job opportunity, for example, without any excuse or justification, other than a malicious allegation of audit issues, intentionally inflicted harm on Leticia, causing it the loss, for example, of the Urban Foundation job and more than $261,700.00 in profits.

## THIRD COUNTERCLAIM

### (Tortious Interference with Contract)

207.    Leticia repeats and realleges each and every allegation contained in Paragraph 1 through 206, as if set forth herein in their entirety.

208.    Leticia had a valid contract with Phoenix Constructors JV to perform certain trucking work and was in fact performing trucking work commencing in or about April 2008.

209.    The Union Representative Trustees, Local 282 and the Local 282 Funds had actual knowledge of this contract because Leticia had been working on the job, employing Local 282 drivers, and making contributions to the Local 282 Funds while on the job.

210.    Under the authorization and direction of Local 282, the Union Representative Trustees and the Local 282 Funds acting on behalf of and as agents for the Union, the inflated, discriminatory wage and benefit costs arbitrarily and maliciously imposed upon Leticia through enforcement of the purported "key-to-key" pay obligation caused Phoenix Constructors JV to breach its contract with Leticia by terminating the agreement prematurely without providing the requisite notice under the contract.

211.    As a result of the purported "key-to-key" payment obligation enforced exclusively on Leticia, Leticia incurred damages in the loss of the Phoenix job amounting to not less than $2,000,000.00.

## FOURTH COUNTERCLAIM

### (Tortious Interference with Prospective Economic Advantage)

212.    Leticia repeats and realleges each and every allegation contained in Paragraph 1 through 211, as if set forth herein in their entirety.

213.    Leticia had preexisting business relationship with Clean Earth and Urban Foundation that led to their offering Leticia a new hazardous debris trucking job contingent on the receipt of an LGS from Local 282 or the Funds.

214.    Leticia had reasonable expectation of prospective economic advantage from this job because she had done work for Clean Earth and Urban Foundation in the past, and there was no legitimate business reason why the Local 282 Funds could not have provided an LGS.

215.    The Union Representative Trustees and Local 282 Funds, acting on behalf of and as agents for the Union, were aware of the business relationship between Leticia and Clean Earth and Urban foundation and the prospective economic advantage from that job because of Urban Foundation asked the Funds for an LGS for Leticia.

216.    The Union Representative Trustees and Local 282 Funds, acting on behalf of and as agents for the Union, acted solely out of malice and through dishonest, unfair, and improper means by denying the LGS to Leticia based on false allegations of audit issues.

217.    The denial of the LGS resulted in injury to the business relationship between Leticia and Clean Earth and Urban Foundation and the denial to Leticia of prospective economic advantage from the upcoming job.

218.    The denial of the LGS resulted in the quantifiable loss of $261,170.00 of profit.

219.    The Union Representative Trustees, Local 282 Funds, in concert with, and acting on behalf of and as agents for the Union, intentionally interfered in the business relationship between Leticia and Clean Earth and Urban Foundation, causing Leticia the loss of prospective economic advantage from the upcoming hazardous trucking job, by maliciously alleging that Leticia had audit issues with the wrongful purpose to drive Leticia out of business.

220.    The Union Representative Trustees and Local 282 Funds, acting on behalf of and as agents for the Union,  allegations that Leticia had audit issues were made solely out of malice and resulted in the quantifiable loss of $261,170.00.

*Northwest* Job

221.    Leticia had a business relationship with the Northwest whereby Northwest requested that it perform a 40,000 ton trucking job that would require the use of fifteen of its trucks daily for a period of time.

222.    Leticia had a reasonable expectation that she would receive this work because had done work with Northwest in the past and this work was directly offered to it.

223.    Upon information and belief, Union Representative Trustees and the Local 282 Funds, acting on behalf of and as agents for the Union,  were aware of the business relationship between Leticia and Northwest.

224.    The discriminatory imposition and enforcement purported "key-to-key" pay obligations by the Union Representative Trustees and Local 282 Funds, acting on behalf of and as agents for the Union, interfered with Leticia's ability to remain competitive to obtain the job, thereby harming its business relationship with Northwest and interfering with Leticia's prospective economic advantage from the Northwest 40,000 ton job, causing the loss of profits of about $637,936.20.

225.    The discriminatory imposition and enforcement of the purported "key-to-key" pay obligations by the Union Representative Trustees  and the Local 282 Funds, acting on behalf of and as agents for the Union,  arbitrarily and maliciously interfered with Leticia's prospective economic advantage with Northwest by wrongful means amounting to extreme and unfair economic pressure.

226.    The discriminatory imposition and enforcement of the "key-to-key" pay obligations by the Union Representative Trustees and the Local 282 Funds, acting on behalf of and as agents for the Union, was undertaken solely out of malice and with the wrongful purpose to drive Leticia out of business.

227.    The discriminatory imposition and enforcement of the "key-to-key" pay obligations caused Leticia to lose the Northwest 40,000 ton job to a competitor.

*New York Times Job:*

228.    Leticia had a business relationship with Sean O'Keefe, who employs trucking companies in the course of his work, and has done work for him in the past, including, for example, work in connection with construction projects at JFK Airport.

229.    Sean O'Keefe was in position to hire Leticia for the New York Times job, and Leticia had a valid business expectancy of economic advantage from the New York Times Job once Sean O'Keefe offered the job to Leticia.

230.    Union Representative Trustees and Local 282 and the Local 282 Funds were aware of Leticia's business relationship with Sean O'Keefe because she was remitting union dues and fund contributions on jobs in which Sean O'Keefe was involved.

231.    The discriminatory imposition and enforcement of the "key-to-key" pay obligations by Local 282 and the Local 282 Funds, acting as agents for Local 282, interfered with Leticia's prospective economic advantage from the New York Times job by wrongful means amounting to extreme and unfair economic pressure.

232.    The discriminatory imposition and enforcement of the "key-to-key" pay obligations by Union Representative Trustees, the Local 282, and the Local 282 Funds interfered

with Leticia's prospective economic advantage from the New York Times job, which would have resulted in a profit of at least $432,000.00.

233.   The discriminatory imposition and enforcement of the "key-to-key" pay obligations at the instigation of Union Representative  Trustees, Local 282 and the Local 282 Funds, acting as agents for Local 282 was undertaken solely out of malice and with the wrongful purpose to drive Leticia out of business.

234.   The discriminatory imposition and enforcement of the "key-to-key" pay obligations by Union Representative Trustees, Local 282, and Local 282 Funds, acting as agents for Local 282, caused Leticia to lose the New York Times job to Fusella Trucking, who underbid Leticia because it was not paying "key-to-key."

*Other Prospective Jobs and Lost Opportunities:*

235.   The Union Representative Trustees, Local 282, and Local 282 Funds, acting as agents for Local 282, intentionally interfered in other business relationships of Leticia by the discriminatory imposition and enforcement of "key-to-key," causing Leticia the loss of prospective economic advantage for several jobs, including, but not limited to: the Flushing Industrial Project; the Yankee Stadium job; the World Trade Center Phoenix job; the World Trade Center Shamrock job; the Con Edison job; the MTA/NYCTA Harlem River Project; the PANYNJ Greenwich Street Corridor Construction job; the Soil Safe jobs; the Second Avenue Subway job; Kent Street job; and Manhattan Water Tunnel. Leticia had business relationships with persons involved in selecting trucking companies for these and Union Representative Trustees, Local 282, and the Local 282 Funds knew of these relationships. Moreover, Union Representative Trustees, Local 282, and the Local 282 Funds acted solely out of malice and

through dishonest, unfair, and improper means when they intentionally interfered with Leticia's business relationships, causing injury to these relationships.

236.    The discriminatory imposition and enforcement of the purported "key-to-key" pay obligations by Union Representative Trustees, Local 282, and the Local 282 Funds caused Leticia to lose additional prospective business in the amount of not less than $30,000,000.00.

### AS AND FOR A FIFTH CLAIM FOR RELIEF AGAINST COUNTERCLAIM DEFENDANT UNION OFFICERS THOMAS GESUALDI, LOUIS BISIGNANO, ANTHONY PIROZZI, ANTHONY D'AQUILA, DOMINICK MARROCCO, and WILLIAM MAYE, Individually

### (Prima Facie Tort)

237.    Leticia repeats and realleges each and every allegation contained in Paragraph 1 through 236 as if set forth herein in their entirety.

238.    Counterclaim Defendants Thomas Gesualdi, Louis Bisignano, Anthony Pirozzi, Anthony D'Aquila, Dominick Marrocco and William Maye engaged in concerted efforts to effectuate the repeated and disproportionate auditing of Leticia's books and records, and the manipulation and distortion of the outcome of those audits to produce false claims based upon the requirements arbitrarily and maliciously imposed on Leticia to cause it to pay wages and benefit contributions in excess of those required of other employer signatories to the MTA CBA and its predecessor agreements, that were intentional acts intended to, and which did fact, inflict harm on Leticia, both in the extension of personnel resources to respond to the excessive audit inquiries, and in the payment of quantifiable, extra wages and contributions to the Funds that Leticia would not otherwise have paid, as well as the competitive disadvantage at which such additional costs put Leticia.

239.    As a result of enforcing the "key-to-key" pay obligations against Leticia alone, Thomas Gesualdi, Louis Bisignano, Anthony Pirozzi, Anthony D'Aquila, Dominick Marrocco,

and William Maye intentionally inflicted harm on Leticia by requiring that it pay weekly wages to her employees in excess of what its competitors paid in the industry, without any excuse or justification, resulting in a quantifiable loss to Leticia measured by the additional cost of the wages and contributions to the Funds Leticia paid to and on behalf of each employee since the imposition of the purported "key-to-key" contractual pay obligation.

240.    The Local 282 Funds' refusal to issue the LGS to Leticia, at the behest of and in concern with Counterclaim Defendants Thomas Gesualdi, Louis Bisignano, Anthony Pirozzi, Anthony D'Aquila, Dominick Marrocco, and William Maye in connection with the Urban Foundation job opportunity, for example, without any excuse or justification, other than malicious allegation of audit issues, intentionally inflicted harm on Leticia, causing it the loss, for example, of the Urban Foundation job and more than $261,170.00 in profits.

### AS AND FOR A SIXTH CLAIM FOR RELIEF AGAINST COUNTERCLAIM DEFENDANT UNION OFFICERS THOMAS GESUALDI, LOUIS BISIGNANO, ANTHONY PIROZZI, ANTHONY D'AQUILA, DOMINICK MARROCCO, and WILLIAM MAYE, Individually

### (Tortious Interference with Contract)

241.    Leticia repeats and realleges each and every allegation contained in Paragraph 1 through 240 as if set forth herein in their entirety.

242.    Leticia had a valid contract with Phoenix Constructors JV to perform certain trucking work and was in fact performing trucking work commencing in or about April 2008.

243.    Thomas Gesualdi, Louis Bisignano, Anthony Pirozzi, Anthony D'Aquila, Dominick Marrocco, and William Maye had actual knowledge of this contract because Leticia had been working on the job, employing Local 282 drivers, and making contributions to the Local 282 Funds while on the job.

244.    At the instigation of Counterclaim Defendants Thomas Gesualdi, Louis Bisignano, Anthony Pirozzi, Anthony D'Aquila, Dominick Marrocco, and William Maye, the inflated, discriminatory wage and benefit costs arbitrarily and maliciously imposed upon Leticia through enforcement of the purported "key-to-key" pay obligation caused Phoenix Constructors JV to breach its contract with Leticia by terminating the agreement prematurely without providing the requisite notice under the contract.

245.    As a result of the purported "key-to-key" payment obligation enforced exclusively on Leticia, Leticia incurred damages in the loss of the Phoenix job amounting to not less than $2,000,000.00.

### AS AND FOR A SEVENTH CLAIM FOR RELIEF AGAINST COUNTERCLAIM DEFENDANT UNION OFFICERS THOMAS GESUALDI, LOUIS BISIGNANO, ANTHONY PIROZZI, ANTHONY D'AQUILA, DOMINICK MARROCCO, and WILLIAM MAYE, Individually

### (Tortious Interference with Prospective Economic Advantage)

246.    Leticia repeats and realleges each and every obligation contained in Paragraph 1 through 245, as if set forth herein in their entirety.

247.    Leticia had preexisting business relationship with Clean Earth and Urban Foundation that led to their offering Leticia a new hazardous debris trucking job contingent on the receipt of an LGS from Local 282 or the Funds.

248.    Leticia had reasonable expectation of prospective economic advantage from this job because she had done work for Clean Earth and Urban Foundation in the past, and there was no legitimate business reason why the Local 282 Funds could not have provided an LGS.

249.    Counterclaim Defendants Thomas Gesualdi, Louis Bisignano, Anthony Pirozzi, Anthony D'Aquila, Dominick Marrocco, and William Maye were aware of the business relationship between Leticia and Clean Earth and Urban foundation and the prospective

economic advantage from that job because of Urban Foundation asked the Funds for an LGS for Leticia.

250.    Counterclaim Defendants Thomas Gesualdi, Louis Bisignano, Anthony Pirozzi, Anthony D'Aquila, Dominick Marrocco, and William Maye acted solely out of malice and through dishonest, unfair, and improper means to cause the denial of an LGS to Leticia based on malicious allegations of audit issues with the wrongful purpose of driving Leticia out of business.

251.    The denial of the LGS resulted in injury to the business relationship between Leticia and Clean Earth and Urban Foundation and the denial to Leticia of prospective economic advantage from the upcoming job.

252.    The denial of the LGS resulted in the quantifiable loss of $261,170.00 of profit.

253.    Thomas Gesualdi, Gary LaBarberra, Louis Bisignano, Anthony Pirozzi, Anthony D'Aquila, Dominick Marrocco, and William Maye intentionally interfered in the business relationship between Leticia and Clean Earth and Urban Foundation, causing Leticia the loss of prospective economic advantage from the upcoming hazardous trucking job, by maliciously alleging that Leticia had audit issues with the wrongful purpose to drive Leticia out of business.

254.    Counterclaim Defendants Thomas Gesualdi's, Louis Bisignano's, Anthony Pirozzi's, Anthony D'Aquila's, Dominick Marrocco's, and William Maye's allegations that Leticia had audit issues were made solely out of malice and resulted in the quantifiable loss of $261,170.00.

*Northwest Job:*

255.    Leticia had a business relationship with the Northwest whereby Northwest requested that it perform a 40,000 ton trucking job that would require the use of fifteen of its trucks daily for a period of time.

256.    Leticia had a reasonable expectation that she would receive this work because had done work with Northwest in the past and this work was directly offered to it.

257.    Upon information and belief, Counterclaim Defendants Thomas Gesualdi, Louis Bisignano, Anthony Pirozzi, Anthony D'Aquila, Dominick Marrocco, and William Maye were aware of the business relationship between Leticia and Northwest.

258.    The discriminatory imposition and enforcement purported "key-to-key" pay obligations at the instigation and cooperation of Counterclaim Defendants Thomas Gesualdi, Louis Bisignano, Anthony Pirozzi, Anthony D'Aquila, Dominick Marrocco and William Maye interfered with Leticia's ability to remain competitive to obtain the job, thereby harming its business relationship with Northwest and interfering with Leticia's prospective economic advantage from the Northwest 40,000 ton job, causing the loss of profits of about $637,936.20.

259.    The discriminatory imposition and enforcement of the purported "key-to-key" pay obligations at the instigation and implementation of Counterclaim Defendants  Thomas Gesualdi, Louis Bisignano, Anthony Pirozzi, Anthony D'Aquila, Dominick Marrocco, and William Maye arbitrarily and maliciously interfered with Leticia's prospective economic advantage with Northwest by wrongful means amounting to extreme and unfair economic pressure.

260.    The discriminatory imposition and enforcement of the "key-to-key" pay obligations at the instigation of Counterclaim Defendants Thomas Gesualdi, Louis Bisignano, Anthony Pirozzi, Anthony D'Aquila, Dominick Marrocco, and William Maye was undertaken solely out of malice and with the wrongful purpose to drive Leticia out of business.

261.   The discriminatory imposition and enforcement of the "key-to-key" pay obligations caused Leticia to lose the Northwest 40,000 ton job to a competitor.

*New York Times Job*

262.   Leticia had a business relationship with Sean O'Keefe, who employs trucking companies in the course of his work, and has done work for him in the past, including, for example, work in connection with construction projects at JFK Airport.

263.   Sean O'Keefe was in position to hire Leticia for the New York Times job, and Leticia had a valid business expectancy of economic advantage from the New York Times Job once Sean O'Keefe offered the job to Leticia.

264.   Counterclaim Defendants Thomas Gesualdi, Louis Bisignano, Anthony Pirozzi, Anthony D'Aquila, Dominick Marrocco, and William Maye were aware of Leticia's business relationship with Sean O'Keefe because she was remitting union dues and fund contributions on jobs in which Sean O'Keefe was involved.

265.   The discriminatory imposition and enforcement of the "key-to-key" pay obligations at the instigation and cooperation of Counterclaim Defendants Thomas Gesualdi, Louis Bisignano, Anthony Pirozzi, Anthony D'Aquila, Dominick Marrocco, and William Maye interfered with Leticia's prospective economic advantage from the New York Times job by wrongful means amounting to extreme and unfair economic pressure.

266.   The discriminatory imposition and enforcement of the "key-to-key" pay obligations at the instigation and cooperation of Counterclaim Defendants Thomas Gesualdi, Louis Bisignano, Anthony Pirozzi, Anthony D'Aquila, Dominick Marrocco, and William Maye interfered with Leticia's prospective economic advantage from the New York Times job, which would have resulted in a profit of at least $432,000.00.

267.    The discriminatory imposition and enforcement of the "key-to-key" pay obligations at the instigation of Counterclaim Defendants Thomas Gesualdi, Louis Bisignano, Anthony Pirozzi, Anthony D'Aquila, Dominick Marrocco, and William Maye was undertaken solely out of malice and with the wrongful purpose to drive Leticia out of business.

268.    The discriminatory imposition and enforcement of the "key-to-key" pay obligations by Counterclaim Defendants Thomas Gesualdi, Louis Bisignano, Anthony Pirozzi, Anthony D'Aquila, Dominick Marrocco, and William Maye caused Leticia to lose the New York Times job to Fusella Trucking, who underbid Leticia because it was not paying "key-to-key."

269.    Counterclaim Defendants Thomas Gesualdi, Gary LaBarbera, Louis Bisignano, Anthony Pirozzi, Anthony D'Aquila, Dominick Marrocco, and William Maye intentionally interfered in other business relationships of Leticia by the discriminatory imposition and enforcement of "key-to-key," causing Leticia the loss of prospective economic advantage for several jobs, including, but not limited to: the Flushing Industrial Project; the Yankee Stadium job; the World Trade Center Phoenix job; the World Trade Center Shamrock job; the Con Edison job; the MTA/NYCTA Harlem River Project; the PANYNJ Greenwich Street Corridor Construction job; the Soil Safe jobs; the Second Avenue Subway job; Kent Street job; and Manhattan Water Tunnel. Leticia had business relationships with persons involved in selecting trucking companies for these and Counterclaim Defendants Thomas Gesualdi, Louis Bisignano, Anthony Pirozzi, Anthony D'Aquila, Dominick Marrocco, and William Maye knew of these relationships. Moreover, Counterclaim Defendants Thomas Gesualdi, Louis Bisignano, Anthony Pirozzi, Anthony D'Aquila, Dominick Marrocco, and William Maye acted solely out of malice and through dishonest, unfair, and improper means when they intentionally interfered with Leticia's business relationships, causing injury to these relationships.

270.    The discriminatory imposition and enforcement of the purported "key-to-key" pay obligations by Counterclaim Defendants Thomas Gesualdi, Louis Bisignano, Anthony Pirozzi, Anthony D'Aquila, Dominick Marrocco and William Maye caused Leticia to lose additional prospective business in the amount of not less than $30,000,000.00.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rules of Civil Procedure Rule 38, Defendant Leticia demands trial by jury of all issues triable of right by a jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Leticia respectfully requests that the Court (a) deny all the relief, remedies, and judgment damages requested by the plaintiffs; (b) award Leticia damages on the counterclaims, including punitive damages as appropriate, or alternatively, an offset of future benefit fund contributions in an amount equivalent to proven damages; (c) order all Counterclaim Defendants to jointly and/or severally satisfy any award rendered for Leticia on the counterclaims; (d) order that section 30 of the MTA CBA be stricken therefrom and/or that Local 282 be ordered to cease and desist from attempting to hold Leticia jointly and severally liable for its claims against York-Jersey; (e) award Leticia its reasonable attorney' fees' and costs of this proceeding, including those discretionary fees available pursuant to 29 U.S.C. §1132(g)(1), and (f) grant Leticia any such other relief that the Court deems just and proper.

Respectfully submitted,

**Law Offices of Angelo R. Bianchi, LLC**

S:/ ANGELO R. BIANCHI
        ANGELO R. BIANCHI, ESQ.

Dated: July 30, 2011

56

## CERTIFICATE OF SERVICE

I hereby certify and declare under penalty of perjury, pursuant to Title 29 U.S.C. §1746,

that, on July 30, 2011, I caused to be served a true and correct copy of: DEFENDANT LETICIA,

INC.'S ANSWER AND DEFENSES TO PLAINTIFF'S COMPLAINT by arranging the original

Answer to be filed through the Court's ECF system with same to then be sent electronically to all

registered participants as identified on the Court's Notice of Electronic Filing and paper copies to

be sent to those indicated, if any, as non-registered participants by United States First Class Mail.


                                         S:/ ANGELO R. BIANCHI_____
                                             ANGELO R. BIANCHI, ESQ.


Dated: July 30, 2011